[Cite as *State v. Bellamy*, 2014-Ohio-5187.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


STATE OF OHIO, : 

    Plaintiff-Appellee, :     CASE NO.  CA2013-09-170

      :     O P I N I O N

- vs -     11/24/2014

      : 

CHRISTOPHER K. BELLAMY, : 

    Defendant-Appellant. : 


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2013-05-0695


Michael T. Gmoser, Butler County Prosecuting Attorney, Kimberly L. McManus, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Fred Miller, Baden & Jones Bldg., 246 High Street, Hamilton, Ohio 45011, for defendant-appellant


**HENDRICKSON, J.**

{¶ 1} Defendant-appellant, Christopher K. Bellamy, appeals from a decision in the Butler County Court of Common Pleas convicting him of menacing by stalking and violating a protection order. For the reasons outlined below, we affirm the decision of the trial court.

{¶ 2} Bellamy and Jenny Murray lived together as boyfriend and girlfriend for a period of about four years from 2009 to March 2013. During this time, the couple had a son

together. In March 2013, Murray ended the relationship, and on the same day, Murray obtained a protection order. An indictment was later filed against Bellamy for violating a protection order and menacing by stalking for allegedly making threatening calls to the nursing home where Murray worked.

{¶ 3} At the beginning of a jury trial, Bellamy's counsel stated that Bellamy would admit to violating the protection order, but that Murray was texting and emailing him during the time the protection order was in place. Bellamy's counsel stated that the jury "will see, and hear, messages and text messages from [Murray] that she wanted to re-establish the relationship; that she was sorry for all the things that she had done to him, and this goes on ad infinitum." Bellamy's counsel also stated that Murray had been sending lewd pictures of herself to Bellamy.

{¶ 4} When Bellamy's counsel finished opening statements, the state made a motion in limine because the texts, emails, and pictures were not provided in discovery. At this point, the trial court ruled that because the evidence was not produced in discovery, Bellamy could not use it as substantive evidence. The trial court stated, however, that the evidence could be used to impeach Murray's credibility. The state then presented its case by calling several witnesses, including Murray, Murray's coworkers, a detective with the Hamilton City Police, and two of Bellamy's former significant others.

{¶ 5} Murray, a licensed practical nurse at a nursing home, testified that Bellamy called her at work over a period of months. The calls began when the initial protection order was issued and ended after Bellamy was incarcerated. The caller never identified himself and the calls always came from an unidentified phone number. Nevertheless, Murray testified she recognized the voice of the caller as Bellamy's, the man with whom she had lived with the past four years.

{¶ 6} On many of the calls, the caller would state: "I want my fucking drugs. Give me

- 2 -

my drugs. I'm not playing with you. Give me my fucking drugs." Murray testified that she considered these statements as a threat and was afraid of physical harm. Additionally, Murray testified that she personally received numerous calls to her private number from the same caller and that her son also received calls from an unidentified caller, always asking for drugs. Murray admitted that she voluntarily sent Bellamy text messages after the protection order went into effect, but denied ever sending Bellamy emails. Murray also testified that she and Bellamy met once at a Wal-Mart and spoke for approximately two hours. Murray testified that Bellamy was manipulative and was afraid that if she did not communicate with him, she would lose her job.

{¶ 7} Four of Murray's coworkers testified on behalf of the state. Sonia Schilling, a coworker of Murray's and a former neighbor to both Murray and Bellamy, testified that Bellamy frequently called the nursing home. According to Schilling, the calls occurred as many as 30 times a night. While the caller usually did not identify himself, Schilling stated she recognized the caller's voice as Bellamy's. The caller often stated, "tell the fat bitch to give me my medication." The caller also threatened to put "a bomb under [their] assess" and stated that he was going to damage cars. Schilling testified that on several occasions, broken glass was found in the parking lot. These threats made her feel like she was in danger of physical harm. Schilling also testified that on at least one occasion, Bellamy identified himself and asked for Murray. According to Schilling, Bellamy also asked her to call him from the nursing home's phone to make it look like Murray was contacting him while she was working.

{¶ 8} Jean Jacobsen was the second coworker of Murray's to testify. Jacobsen testified she would answer four or five calls per night over a period of a month from an unknown caller asking for Murray, demanding drugs, and making threats. Jacobsen testified that the caller threatened to kill both her and Murray. According to Jacobsen, the phone calls

were disruptive to her work and caused her to fear physical harm.

{¶ 9} Miriam Houston, a third co-worker of Murray's to testify, stated that she also answered phone calls from a person whom she believed to be Bellamy, calling from an unknown number, asking for Murray, and demanding drugs. Houston testified that the caller told her to "watch [her] back" and threatened to kill her. Houston stated the threats made her a "nervous wreck" and affected her ability to work. Houston also testified that she was "scared to death" and did not like to walk to the parking lot. Houston stated that her husband had to come get her from work on several occasions. Houston testified that the calls only occurred when Murray was to be at work, and when Bellamy went to jail, the calls stopped.

{¶ 10} Kristin Asher, the director of nursing at the nursing home, testified that the calls disrupted the work environment as they tied up phone lines and distracted nurses from providing patient care. Additionally, Asher testified that a few of the employees threatened to resign because they were fearful of their safety. Such disruptions prompted the nursing home to hire a security guard who was no longer needed after Bellamy was arrested.

{¶ 11} Hamilton Police Detective Paul Davis investigated threats to the employees at the nursing home and testified on the state's behalf. During the investigation, Detective Davis was meeting with the director of nursing at the nursing home along with several other employees when the phone rang. The person who called was identified by the employees as the person making threats. Within 20 minutes of the call, Detective Davis called Bellamy from the police station and requested that Bellamy come to the station. At the station, Bellamy denied calling the nursing home and then stated that he was just calling on behalf of a loan company. Detective Davis testified that the voice on both calls was Bellamy's.

{¶ 12} Bellamy's ex-wife, Amanda Bellamy, and Bellamy's former girlfriend, Keli Adkins, both testified. Amanda testified that after her relationship ended with Bellamy in 2007, she obtained a protection order against Bellamy. After obtaining the protection order,

Bellamy contacted Amanda at her place of employment from a restricted number. Amanda testified that Bellamy admitted to her that he had called Murray at work. Adkins testified that after she and Bellamy broke off their relationship, Adkins obtained a protection order against Bellamy. Despite the protection order, Bellamy would call Adkins multiple times an hour over the course of a month and even on one occasion broke into the house where she was working.

{¶ 13} Bellamy testified on his behalf. Bellamy admitted to violating the protection order by speaking with Murray after the protection order was in place. Bellamy testified that these conversations were always friendly because of his desire to see their son. Bellamy testified that he sent nonthreatening texts and emails after the protection order went into effect. Bellamy denied ever calling Murray at the nursing home. Bellamy also testified that he takes medication prescribed by his doctor, but that he had no reason to call the nursing home because he has no difficulty filling the prescriptions.

{¶ 14} At the end of the two-day trial, a jury convicted Bellamy of violating a protection order in violation of R.C. 2919.27(A)(1) and menacing by stalking in violation of R.C. 2903.211(A)(1). The trial court sentenced Bellamy to 30 months in prison.

{¶ 15} Bellamy now appeals, asserting a single assignment of error for review:

{¶ 16} THE TRIAL COURT ERRED TO THE PREJUDICE OF [BELLAMY] WHEN IT REFUSED TO ALLOW HIM TO CROSS-EXAMINE WITNESSES WITH CERTAIN TEXT MESSAGES AND EMAILS, AND WHEN IT REFUSED TO ALLOW HIM TO TESTIFY REGARDING THE CONTENTS OF THOSE TEXT MESSAGES AND EMAILS AND WHEN IT RULED THAT THESE DOCUMENTS WERE INADMISSIBLE.

{¶ 17} Bellamy challenges the trial court's decision in preventing the admission of the texts and emails at trial. First, Bellamy argues that the texts provided a defense to the menacing by stalking claim because the contents of the evidence revealed friendly

communication between Bellamy and Murray. Second, while Bellamy admits failing to provide the texts and emails in discovery, Bellamy contends that the exclusion of the evidence was "extreme" and the trial court should have instead granted the state a short continuance in order to review the evidence.

{¶ 18} We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *State v. Grindstaff*, 12th Dist. Clermont No. CA2013-09-074, 2014-Ohio-2581, ¶ 21. "A reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *Id.*, citing *State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 14. An abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Grindstaff* at ¶ 21.

{¶ 19} Generally, relevant evidence is admissible and irrelevant evidence is inadmissible. Evid.R. 402. Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401.

{¶ 20} In order for a trial court to err regarding the admission or exclusion of evidence during the examination in chief pursuant to Evid.R. 103(A), two conditions must be met: "(1) the exclusion of such evidence must affect a substantial right of the party *and* (2) the substance of the excluded evidence was made known to the court by proffer *or* was apparent from the context within which questions were asked." *State v. Darrah*, 12th Dist. Warren No. CA2006-09-109, 2007-Ohio-7080, ¶ 18, citing *State v. Gilmore*, 28 Ohio St.3d 190, 191 (1986). "If a party claiming error is unable to establish the first requirement, the error is deemed harmless. If the party is unable to establish the second requirement, the error is deemed waived." *Darrah* at ¶ 18, citing *Campbell v. Johnson*, 87 Ohio App.3d 543, 551 (2d Dist.1993).

{¶ 21} In this instance, the trial court did not abuse its discretion in excluding the texts and emails because the excluded evidence was not relevant and did not affect a substantial right of Bellamy's. Bellamy admitted to violating the protection order, but denied that he engaged in menacing by stalking, claiming that a third party made threating phone calls to the nursing home where Murray worked. The menacing by stalking statute, R.C. 2903.211(A)(1), provides:

> No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person. In addition to any other basis for the other person's belief that the offender will cause physical harm to the other person or the other person's mental distress, the other person's belief or mental distress may be based on words or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs.

Defense counsel stated that the emails and text messages indicated that Bellamy and Murray were communicating in a "friendly manner." However, Bellamy caused Murray and her coworkers to be fearful of physical harm, not by emails and text messages, but through telephone conversations. Whether Bellamy presented a friendly tone in his emails and text messages has no relevance as to the threatening and intimidating statements he made during the numerous telephone conversations he had with Murray and the other witnesses. Furthermore, Murray testified that Bellamy was manipulative, so she was afraid she would lose her job if she did not communicate with him.[1] She specifically testified that she took the calls as threats and stated "I don't know what he's capable of anymore." Thus, Murray could feel threatened by Bellamy and be fearful of him causing her physical harm while still

---

1. While Bellamy's argument focuses on the texts and emails showing a "friendly" relationship between Murray and him, the texts also purport to show that Bellamy told Murray to contact the police. Bellamy was given the opportunity to testify that a third-party made the threatening phone calls. In addition to presenting several inadmissibility issues, any error in excluding the communication indicating a third-party was involved was harmless, as discussed, due to the overwhelming evidence.

engaging in friendly communication.

{¶ 22} Even if the emails and texts were relevant and the trial court erred in excluding them as evidence, any error was harmless. *See* Crim.R. 52(A). The overwhelming evidence pointed to Murray's guilt. Numerous witnesses testified that there were threating calls to the nursing home where Murray worked which is permissible by statute as the basis for belief of physical harm or mental distress. The evidence also established that these calls, often occurring multiple times on the nights Murray was scheduled to work, lasted over a month. The calls began when Murray obtained the protection order and ended when Bellamy was arrested. Murray, Schilling, and Detective Davis all identified the voice of the caller as Bellamy's. *See* Evid.R. 901(B)(5). Finally, Evid.R. 404(B) evidence was introduced revealing that Bellamy had violated other protection orders obtained by his ex-wife and former girlfriend. Consequently, error, if any, in excluding the texts and emails was harmless as it did not affect a substantial right of Bellamy's.

{¶ 23} Furthermore, the trial court did not err in excluding the emails and texts due to a discovery violation. According to Crim.R. 16(H), "[i]f the defendant serves a written demand for discovery or any other pleading seeking disclosure of evidence on the prosecuting attorney, a reciprocal duty of disclosure by the defendant arises without further demand by the state." The defendant shall provide copies of "[a]ny evidence that tends to negate the guilt of the defendant * * *." *Id.*

{¶ 24} If a party fails to comply with discovery requirements under Crim.R. 16, a trial court "may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." Crim.R. 16(L). When deciding whether to impose a sanction, a trial court must inquire into the circumstances surrounding a discovery rule violation. *State v. Wilson*, 12th Dist. Butler No. CA2012-12-254, 2013-Ohio-

3877, ¶ 16. It is within the trial court's sound discretion to decide what sanction to impose for a discovery violation. *State v. Davis*, 12th Dist. Butler No. CA2010-06-143, 2011-Ohio-2207, ¶ 20.

{¶ 25} The trial court "must impose the least severe sanction that is consistent with the purpose of the rules of discovery." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, ¶ 42, quoting *City of Lakewood v. Papadelis*, 32 Ohio St.3d 1 (1987), paragraph two of the syllabus. When a defendant violates a discovery rule, imposing a sanction excluding testimony or evidence may infringe on the defendant's Sixth Amendment right to present a defense. *Davis* at ¶ 21, citing *Papadelis* at 5. Nevertheless, exclusion of evidence is a permissible sanction for a criminal defendant's discovery violation as long as the exclusion does not completely deny the defendant the constitutional right to present a defense. *Davis* at ¶ 21. "Factors to be considered by the trial court include the extent to which the prosecution will be surprised or prejudiced by the witness' testimony, the impact of witness preclusion on the evidence at trial and the outcome of the case, whether violation of the discovery rules was willful or in bad faith, and the effectiveness of less severe sanctions." *Id.*

{¶ 26} In this instance, Bellamy admits that he violated the discovery rules, but disagrees with the severity of the sanction excluding the texts and emails from evidence. Bellamy's counsel did not mention the texts or emails until presenting opening statements and did not receive the evidence until the night before trial. The trial court evaluated this information, and determined that the texts and emails should be excluded.

{¶ 27} There is little doubt that waiting until opening statements to reveal the use of the text and email evidence was a total surprise to the prosecution. The state would have been extremely prejudiced by the admission of this evidence as it did not have adequate time to engage in trial preparation or strategy relating to the information contained in the texts and emails. Although it does not appear that Bellamy willfully or in bad faith violated the

discovery rules, it seems odd that he did not immediately bring this matter to the trial court's attention before the trial actually started and waited until the opening statement phase of the trial to alert the trial court of the newly discovered evidence. As a result, the trial court made its decision after the jury had been selected and opening statements were being presented.

**{¶ 28}** While still within the trial court's discretion to continue the trial to accommodate Bellamy's evidentiary request, his argument is further weakened by the effectiveness of this less severe sanction because, as discussed above, the outcome of the trial would not have been different. As such, the trial court did not abuse its discretion in excluding the texts and emails from evidence. Bellamy's sole assignment of error is overruled.

**{¶ 29}** Judgment affirmed.

RINGLAND, P.J., and PIPER, J., concur.